UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Harlan Anderson,

              Plaintiff,                    **MEMORANDUM OPINION AND ORDER**

       v.                                  Civil No. 06-1945 ADM/AJB

Farm Service Agency of the United
States Department of Agriculture,

              Defendant.

_____

Larry J. Peterson, Esq., Peterson, Logren & Kilbury, P.A., St. Paul, MN, argued on behalf of Plaintiff.

Lonnie F. Bryan, Esq., Assistant United States Attorney, Minneapolis, MN, argued on behalf of Defendant.

_____

## I. INTRODUCTION

On April 6, 2007, oral argument before the undersigned United States District Judge was heard on Plaintiff Harlan Anderson's ("Anderson") Motion for Summary Judgment [Docket No. 24]. For the reasons set forth herein, Anderson's Motion is denied and judgment is entered for Defendant Farm Service Agency ("FSA") of the United States Department of Agriculture ("USDA").

## II. BACKGROUND

In the Agricultural Assistance Act of 2003 ("the Act"), Congress directed the Secretary of Agriculture to provide funds from the Commodity Credit Corporation ("CCC") "to make emergency financial assistance available to producers on a farm that have incurred qualifying losses for the . . . 2002 crop of an agricultural commodity . . . due to damaging weather or related condition, as determined by the Secretary." Agricultural Assistance Act of 2003, Title II, Pub.

L. No. 108-7, § 202, 117 Stat. 538, 538 (2003).  The USDA's regulations setting forth the terms and conditions of the 2002 Crop Disaster Program ("CDP") are codified at 7 C.F.R. Part 1480 (2004).  Since the CCC has no operating personnel, the regulations provided that the 2002 CDP would be carried out in the field by FSA.  7 C.F.R. § 1480.2(a) (2004).  Additional guidance regarding the 2002 CDP was provided in the FSA Crop Disaster Program "5-DAP Handbook" (the "Handbook").

Anderson, a farmer in Wright County, Minnesota, sustained losses to his 2002 alfalfa crop due to weather-related disaster conditions.  R. [Docket No. 5] at 000162.  In late July or early August 2003, Anderson applied for benefits under the 2002 CDP.  Id. at 000167.  In his application, Anderson listed his Actual Production History ("APH") Yield as 4.8 tons per acre.  Id. at 000082.

In a letter of August 29, 2003, the FSA approved Anderson's request for 2002 CDP benefits for certain quantities of alfalfa.  Id. at 000050-51.  However, the FSA denied adjustments in those quantities for diminished quality under the Quality Loss Program ("QLP").  Id.  The August 29 letter specified neither the amount of Anderson's CDP benefits nor the payment yield or payment rate that would be used to arrive at an amount.  Id.  Anderson appealed to the USDA National Appeals Division ("NAD").  In a decision dated January 6, 2004, NAD Hearing Officer Michael Shea found that the FSA was in error in its method of determining the scope of Anderson's 2002 alfalfa loss, and that Anderson was entitled to QLP benefits.  Id. at 000058-62.  Neither Anderson nor the FSA requested further administrative review of this decision.  Id. at 000099-100.

On February 12, 2004, the FSA notified Anderson that he was entitled to $14,469 in CDP

QLP benefits for the 2002 crop year losses to his alfalfa crop.  Id. at 000430-33.  In calculating this amount, the FSA used a county average yield of 3.7 tons per acre rather than the APH Yield of 4.8 tons per acre that Anderson submitted.  Id. at 000431.  The FSA explained that the USDA Risk Management Agency ("RMA") did not establish an APH for Anderson's CDP application because of the type of crop insurance Anderson had chosen.  Id.  Additionally, the FSA used a state-wide payment rate of $74 per ton, rather than the $111 per ton rate that Anderson had submitted.  Id.

On June 16, 2004, Anderson filed a Complaint in this Court seeking enforcement of NAD Hearing Officer Shea's January 6, 2004 decision and an award of $61,948.82 in QLP payments based on Anderson's submitted APH Yield and payment rate figures.  2004 Petition [Civ. No. 04-2971 ADM/AJB, Docket No. 1].  On November 23, 2004, this Court remanded the case to the NAD because Hearing Officer Shea's January 2004 decision did not address payment yield or payment rate issues.  Nov. 2004 Order [Civ. No. 04-2971 ADM/AJB, Docket No. 22].

On February 2, 2005, NAD Hearing Officer Clay Van De Bogart ("Van De Bogart") found that the FSA's February 12, 2004 decision awarding $14,169 in CDP benefits was not clearly erroneous.  R. at 000161-63.  On April 21, 2005, a USDA Deputy Director issued a Director Review Determination concurring with the February 2 NAD decision.  Id. at 000166-71.  However, on August 30, 2005, the Deputy Director granted Anderson's request for reconsideration and again remanded the case to a hearing officer to enable the parties to submit certain additional evidence and legal arguments.  Id. at 000104-05.

On September 7, 2005, Anderson requested that his remand hearing be reassigned to a new hearing officer because of Van De Bogart's potential bias.  Id. at 000446.  Finding no

3

conflict of interest or condition of bias, a Deputy Assistant Director denied Anderson's request on September 13, 2005. Id. at 000444-45. On October 19, 2005, Hearing Officer Van De Bogart again found that the FSA's decision to award a QLP payment of $14,169 based on a county average yield of 3.7 tons per acre and a payment rate of $74 per ton was not erroneous. Id. at 000317-24. This decision was upheld in a February 10, 2006 Director Review Determination. Id. 000154-60.

Anderson filed his Petition for Review [Docket No. 1] on May 18, 2006. Anderson claims the FSA has committed errors of law and that its actions are arbitrary, capricious, and an abuse of discretion.

### III. DISCUSSION

**A.    Standard of Review under the Administrative Procedure Act[1]**

The standard for review of Anderson's Motion is that set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06. The APA states that an agency's decision, including its actions, findings and conclusions, should not be overturned unless it is unsupported by substantial evidence, or if it is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. See 5 U.S.C. § 706(2). "The arbitrary and capricious standard is a narrow one that reflects the deference given to agencies' expertise within their respective fields. As long as the agency provides a rational explanation for its decision, a reviewing court cannot disturb it." Henry v. U.S. Dep't of the Navy, 77 F.3d 271, 272 (8th Cir. 1996). "[S]ubstantial

---

[1] Anderson has filed a Motion for Summary Judgment. However, under the Pretrial Scheduling Order [Docket No. 20] and the Stipulation to Amend Pretrial Scheduling Order [Docket No. 21], this matter is ripe for a final judicial determination. Accordingly, the summary judgment standard specified in Federal Rule of Civil Procedure 56 does not apply.

evidence is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions does not indicate that substantial evidence fails to support an agency's findings." Id. at 273. While an agency must articulate a "rational connection between the facts found and the choice made," a court "will uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned." Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285-86 (1974).

**B.      Payment Yield**

The parties do not dispute that the higher of a farmer's APH Yield or the county average yield should be used as the yield for determining Anderson's CDP benefits. See R. at 000022. There is also no dispute that Anderson maintained and filed the necessary records to calculate an APH Yield for his 2002 alfalfa crop. Nevertheless the FSA determined that under the governing regulations, Anderson did not have an APH Yield for 2002. Anderson claims that the regulations do not support this conclusion.

Under 7 C.F.R. § 1480.3 (2004), producers of an "eligible crop" are entitled to 2002 CDP benefits. A crop insured by Federal Crop Insurance Corporation ("FCIC")[2] meets the definition of an eligible crop. See 7 C.F.R. § 1480.3 (2004). Prior to the 2001 crop year, Anderson carried Multiple Peril Crop Insurance ("MPCI"), which is an "insurance polic[y] reinsured by FCIC that offers coverage for loss of production." 7 C.F.R. § 400.701 (2004). An MPCI policy is part of the APH Coverage Program. See 7 C.F.R. Part 400, Subpart G (2004). An Approved APH Yield is "[a] yield, calculated and approved by [a person authorized by the FCIC], used to

---

[2] The FCIC is a wholly owned government corporation within USDA. 7 C.F.R. § 400.701 (2004). For all practical purposes, the FCIC and the RMA are one and the same.

determine the production guarantee" that triggers insurance indemnity payments. Id.  A farmer in the APH Program can submit actual yield data that the FCIC uses to determine the farmer's Approved APH Yield.  7 C.F.R. § 400.52(e) (2004).  The parties do not dispute that the FCIC relies on Rural Community Insurance Services ("RCIS") to maintain the necessary data.  R. at 000245.  If a farmer does not submit verifiable actual yield data, then the Approved APH Yield will be based on "a yield assigned by the FCIC in accordance with the crop insurance contract." 7 C.F.R. § 400.52(f) (2004).

Beginning with the 2001 crop year, Anderson switched to Group Risk Plan ("GRP") insurance, provided for in 7 C.F.R. Part 407 (2003).  Anderson's alfalfa crop remained under GRP insurance for the 2002 crop year.  The GRP common policy states that GRP "is designed as a risk management tool to insure against widespread loss of production of the insured crop in a county."  7 C.F.R. § 407.9 (2003).  GRP policies provide indemnities based solely on whether county average yields are affected.  A farmer's individual losses are irrelevant to GRP insurance, and therefore it is unnecessary for farmers to submit the necessary production reports to calculate an APH.  When Anderson signed his GRP policy, he signed a Group Risk Plan Disclaimer stating that:

> This is not a plan of insurance against individual loss.  The terms and conditions of this plan are different from those of the actual production history plan of multiple peril crop insurance.
>
> . . . .
>
> You may have a low yield on your farm and not receive payment under the group risk plan.  This program is based upon county yields, not individual farm yields.
>
> You should continue to maintain all your production records in case you wish to purchase the actual production history plan of multiple peril crop insurance in future years.

R. at 000294.  Although not required under his GRP policy, Anderson submitted production records necessary to calculate an Approved APH Yield for his 2002 alfalfa crop.  Petersen Aff. [Docket No. 27] Ex. B at 72-74.

In calculating Anderson's 2002 CDP benefits, the FSA found that Anderson did not have an Approved APH Yield for his 2002 alfalfa crop because his GRP policy did not require the calculation of an Approved APH Yield.  R. at 000158-59.  Therefore, the FSA used the county average yield to determine Anderson's CDP benefits.  Id.  Anderson argues the FSA's use of a county average yield was not supported by substantial evidence and was an error of law.

Relying on 7 C.F.R. § 400.52 (2004) and 7 C.F.R. § 1480.3 (2004),[3] Anderson contends that "the regulations which define what an APH/approved yield is do not require that a farmer carry any certain kind of insurance in order to meet those definitions."  Mem. in Supp. of Mot. for Summ. J. [Docket No. 26].  This argument misses the mark.  The regulations governing GRP insurance do not provide for the calculation of an Approved APH Yield and therefore an Approved APH Yield was not calculated for Anderson's 2002 alfalfa crop.  The fact that Anderson submitted the production records necessary to calculate an Approved APH Yield does not change this result.

Moreover, assuming arguendo that Anderson had an Approved APH Yield, the county average yield of 3.7 acres per ton would still apply.  By definition an Approved APH Yield is "[a] yield, calculated and approved by [a person authorized by the FCIC], used to determine the

---

[3] 7 C.F.R. § 1480.3 defines an "Approved Yield" as "the amount of production per acre, computed in accordance with the FCIC's Actual Production History Program . . . or for crops not included under 7 CFR part 400, Subpart G, the yield used to determine the guarantee."

production guarantee" that triggers insurance indemnity payments. 7 C.F.R. § 400.52(e) (2004). Here, the yield used to determine Anderson's production guarantee under his GRP policy was the county average yield of 3.7 acres per ton, and not his individual yield of 4.8 acres per ton.

Accordingly, FSA's decision to use a yield of 3.7 tons per acre is supported by substantial evidence and was not an error of law.

**C.    Payment Rate**

FSA determined that the payment rate for calculation of Anderson's CDP benefits was a statewide rate of $74 per ton. Anderson disagrees, and claims that the rate of $111 per ton used for his GRP insurance payment is the correct rate. Under 7 C.F.R. § 1480.12(a)(1) (2004), "[p]ayments made . . . to a producer for a loss on a unit with respect to yield based crops are determined by multiplying the payment rate established by CCC, times the loss of production which exceeds 35 percent of expected production, as determined by CCC, of the unit." The FSA Handbook provides that:

> If the crop is insurable by RMA and RMA has established 1 rate nationwide, then use the nationwide rate in all counties in all States.
>
> If the crop is insurable by RMA somewhere in the State (even if not available in every county) and RMA has 1 rate Statewide, then use the Statewide rate in all counties.

R. at 000023.

FSA determined that RMA had not established a nationwide rate; therefore Anderson's benefits were calculated using a statewide rate of $74 per ton applicable to all Wright County farmers receiving CDP benefits for forage crops such as alfalfa. Id. at 000431, 481. Anderson claims, however, that a nationwide rate was established. To support his argument, Anderson relies on the fact that his GRP insurance benefits were calculated using a rate of $111 per ton

8

that was based on the "FCI [Federal Crop Insurance] - 35 Coverage and Rates" table. Id. at 000094.

After reviewing the record, the Court finds that the FSA's determination that no nationwide rate existed is supported by substantial evidence. There is nothing in the regulations nor in the record establishing that the GRP insurance payment rate of $111 per ton for Anderson's 2002 alfalfa crop was the nationwide rate. Further, the record contains a publicly available USDA document showing that the relevant rate in Wright County for the 2002 crop year was $74 per ton. See id. at 000481. The Court finds that FSA's use of the $74 per ton payment rate is supported by substantial evidence and was not an error of law.

**D.    Bias**

Anderson argues his September 2005 request for a new hearing officer should have been granted because of Hearing Officer Van De Bogart's potential bias. "A fair trial in a fair tribunal is a basic requirement of due process. This applies to administrative agencies which adjudicate as well as to courts." Withrow v. Larkin, 421 U.S. 35, 47 (1975) (quotations omitted). Hearing officers "serve in a quasi-judicial capacity, similar in many respects to that of administrative law judges." Schweiker v. McClure, 456 U.S. 188, 195 (1982). A court must start "from the presumption that the hearing officers who decide [CDP] claims are unbiased. This presumption can be rebutted by a showing of conflict of interest or some other specific reason for disqualification." Id.

As evidence of Hearing Officer Van De Bogart's potential bias in September 2005, Anderson relies on the following: (1) Van De Bogart's February 2005 NAD decision had already addressed the yield and payment rate issues; (2) Van De Bogart allegedly relied upon incorrect

evidence and law in his February 2005 decision, and (3) Van De Bogart allegedly made similar mistakes when adjudicating a 1995 crop disaster claim that Anderson successfully appealed. This evidence is insufficient to demonstrate a potential for bias.  Instead, it establishes only that Van De Bogart ruled against Anderson in the past.  Parties who successfully appeal a judge's order frequently appear again before the same judge.  The mere fact of previous adverse rulings, by itself, does not demonstrate a potential for bias.

Anderson also argues that Van De Bogart's October 2005 decision shows he had "prejudged" the September 2005 remand hearing, since Van De Bogart "tenaciously stuck to his [previous] point of view regarding the calculation of [Anderson's] CDP payments."  Reply Mem. in Supp. of Mot. for Summ. J. [Docket No. 31] at 5.  However, the Deputy Director remanded the case in August 2005 for the limited purpose of taking certain additional evidence and legal arguments.  Given the limited purpose of the remand, it is unsurprising that Hearing Officer Van De Bogart would reach the same conclusions he had reached in February 2005.  The Court finds that Anderson's speculative bias arguments are unsupported by the record and there is no cause to remand this case for a new hearing.  Anderson has failed to overcome the presumption that a hearing officer is unbiased.  Since all of Anderson's arguments fail, judgment will be entered for FSA.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff Harlan Anderson's Motion for Summary Judgment [Docket No. 24], construed as a motion for judgment on the merits, is **DENIED**; and

2. Since the parties agreed that this matter is ripe for adjudication on the administrative record, the Court **GRANTS** judgment to Defendant Farm Service Agency of the United States Department of Agriculture.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

              BY THE COURT:


              s/Ann D. Montgomery
              ANN D. MONTGOMERY
              U.S. DISTRICT JUDGE

Dated: June 8, 2007.